MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2014 ME 45
Docket:      Kno-12-541
Argued:      February 11, 2014
Decided:     March 20, 2014

Panel:       SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and
             JABAR, JJ.

STATE OF MAINE

v.

ARNOLD A. DIANA

MEAD, J.

[¶1] Arnold A. Diana appeals from a judgment of conviction entered by the trial court (*Hjelm, J.*), and from the sentence it imposed, following a jury verdict finding him guilty of murder, 17-A M.R.S. § 201(1)(A) (2013). Diana contends that the court erred in (1) denying his motion to suppress the evidence resulting from three searches of his residence by law enforcement officers, (2) allowing a prospective juror who was once a victim of domestic violence to serve on the jury, (3) denying his motion to exclude certain physical evidence and failing to exclude expert and nonexpert testimony concerning the significance of that evidence, and (4) setting his basic sentence at forty years before arriving at a final sentence of forty-five years. Discerning no error, we affirm the judgment and the sentence.

## I. BACKGROUND

[¶2] When "[v]iewed in the light most favorable to the jury's verdict, the record supports the following facts." *See State v. Ormsby*, 2013 ME 88, ¶ 2, 81 A.3d 336. In November 2010, John Savage began dating Katrina Windred. They planned to have dinner at Windred's home the evening of November 20, 2010, so that they could meet each other's children. That day, Windred took several phone calls from Arnold Diana, a former boyfriend whom she had recently stopped seeing. She left her home in the afternoon to pick up her son from his father's house and to drop off groceries for Diana, telling Savage that she would see him in an hour. When she did not return that night and could not be reached by phone, Savage called the police.

[¶3] Tiffany Walker, Windred's close friend, knew Diana. When Walker awoke on the morning of November 21, she had phone messages from Diana saying that Windred's son was with him but Windred was not there. Walker later spoke to Diana; he told her that Windred's car was at his apartment with her dog locked inside. Diana said that Windred had gone out to meet a boyfriend the previous night, leaving her son with him, and never returned. Fearing that something had happened to Windred, Walker also called the police.

[¶4] Windred's son, age twelve at the time of the trial, testified that Diana had once been his mother's boyfriend. On the last day he saw his mother, she

picked him up and they went to the grocery store, planning to drop groceries off at Diana's residence and then go home to have dinner with Savage. They drove to Diana's apartment and he came out to meet them. Windred went inside with Diana but the boy stayed in the car reading comic books. After a long time, Diana came out and told him that his mother was upstairs sleeping, which the boy thought was unusual because she had not slept at Diana's apartment before. The boy went up to Diana's apartment, leaving the dog in the car, which was also unusual.

[¶5] Once in the apartment, Windred's son saw that the bedroom door was closed. Diana told him that Windred was sleeping and he should be careful not to wake her. As the boy watched a movie, Diana went in and out of the bedroom frequently. That evening Diana took him to the bank where Diana withdrew cash. When they returned to the apartment, the bedroom door was still closed. The boy resumed watching movies.

[¶6] When it became quite late, Windred's son and Diana went into the dark bedroom to go to sleep. The boy saw what he described as "[t]he form of what looked like my mother on the bed" with a blanket pulled completely over her head. Both of those observations struck him as very unusual because his mother was a cancer patient who had to fall asleep in a sitting position with her arm propped up on pillows to prevent swelling, and she never had covers over her face. Windred's ex-husband confirmed Windred's sleeping habits when he testified. The boy tried

4

to sleep beside Diana on the floor next to the bed. When the boy could not get to sleep, Diana sent him out of the room and closed the door. When Diana let the boy back in, he told him to sleep on the bed; the "form" that the boy believed was his mother was then on the floor. When the boy awoke the next morning, Diana was already up and the form was gone; Diana told him that his mother had gone out with friends.

[¶7] A deputy and a detective from the Knox County Sheriff's Office were assigned to try to locate Windred on the morning of November 21. They found her car locked in the parking lot outside Diana's apartment building with her dog inside. Eventually they made contact with Diana and conducted a twenty-minute search of his apartment at the request of Diana's probation officer. The officers saw, but did not seize, a pillow with a red-brown stain on a closet shelf. That evening, Diana was interviewed by a Maine State Police detective and his apartment was searched again after he signed a consent form. Diana agreed to give the detective the pillow that had been seen earlier, and another detective located a second stained pillow. The stains on both pillows proved to be blood that a forensic DNA analyst at the State Police crime laboratory matched to Windred.

[¶8] On November 23, a State Police detective located, in a dumpster area outside Diana's building, a bag of trash that contained a purple towel, a note with the word "Arnold" written on it, cigarette butts containing Diana's DNA, and a

jacket containing hair and blood that were later DNA-matched to Windred. That day, a man walking his dog about two miles from Diana's apartment discovered Windred's body wrapped in a quilt in the woods near a quiet road. An expert testified at trial that, in his opinion, two strips of purple towel that were tied around the quilt came from the purple towel found in the trash bag outside Diana's building. The Chief Medical Examiner testified that Windred died from asphyxia due to strangulation, most likely a manual strangulation. The degree of rigor mortis she observed was consistent with a time of death three days before the body was discovered.

[¶9] On November 24, a search warrant was executed at Diana's apartment. Inside a seat cushion found in a kitchen trash can, detectives discovered Windred's eyeglasses, cell phone, driver's license, social security card, medical and debit cards, and a wallet containing one of her checks. Diana was interviewed for a third time on November 27. He was charged with Windred's murder following the interview.

[¶10] After he was indicted by the grand jury, Diana filed motions to suppress statements he made to police and any evidence derived from the searches of his apartment. Following a hearing the court suppressed some of Diana's statements, but it declined to suppress evidence resulting from the searches. The case went to trial in July 2012 and the jury returned a verdict of guilty. At a later

6

sentencing hearing the court entered judgment, imposing a sentence of forty-five years' imprisonment and $2747.46 in restitution. Diana appealed and filed an application to allow an appeal of his sentence, which the Sentence Review Panel granted.

## II. DISCUSSION

A.    Motion to Suppress

[¶11]  "We review the denial of a motion to suppress for clear error as to factual issues and de novo as to issues of law, and will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *Ormsby*, 2013 ME 88, ¶ 9, 81 A.3d 336 (quotation marks omitted).  Diana challenged three searches of his residence in his motion to suppress: (1) a warrantless search conducted by a deputy and a detective from the Knox County Sheriff's Office on the afternoon of November 21, 2010, which the court found was authorized by Diana's probation conditions; (2) a warrantless search conducted by Maine State Police detectives on the evening of November 21, which the court found was justified by Diana's consent; and (3) a search conducted on November 24 pursuant to a search warrant, which Diana unsuccessfully

challenged as a violation of the rule announced in *Franks v. Delaware*, 438 U.S. 154 (1978).[1]

[¶12]  On appeal, Diana primarily challenges the first search and then asserts that subsequent searches were tainted by its illegality.  We conclude that the trial court correctly found that all three searches at issue were lawful and discuss only the first search here.

[¶13]   The court's factual findings concerning that search, summarized below, are supported by competent evidence in the record and are therefore not clearly erroneous.  *See Pelletier v. Pelletier*, 2012 ME 15, ¶ 13, 36 A.3d 903.  On November 21, 2010, Knox County Deputy Donald Murray spoke to three people who were concerned as to the whereabouts of Katrina Windred: John Savage, who

---

[1]  In *Franks*, the Supreme Court held that

> where [a criminal] defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in [a search] warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.  In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

The *Franks* rule also applies "if the overall falsity of the affidavit arises out of the [intentional or reckless] omission of facts negatory of probable cause."  *State v. Dickinson*, 2005 ME 100, ¶ 8, 881 A.2d 651 (quotation marks omitted).  The trial court denied Diana's request for a full evidentiary hearing after finding that probable cause existed to issue the challenged search warrant even if the warrant affidavit had included information that Diana contended was improperly omitted.

reported that Windred went to Rockland the previous day to pick up her son and to drop off some groceries, but never returned that evening for a planned dinner; Tiffany Walker, who expressed concern as to Windred's welfare and reported that Windred had been at Diana's residence in Rockland the previous day; and Windred's ex-husband.

[¶14]  Murray contacted Detective Dwight Burtis for assistance, and, after learning that Diana was on probation, he spoke with George Mele, Diana's probation officer.  Mele asked Detective Murray to conduct a probation check if he had contact with Diana.  The conditions of Diana's probation included a provision requiring him to "submit to random search and testing for alcohol, drugs, firearms, [and] dangerous weapons at the direction of a probation or law enforcement officer."  Murray called Diana and reached him at the Salvation Army in Rockland.

[¶15]  Detective Burtis went to the Salvation Army and found Diana, who agreed to return to his apartment to discuss where Windred might be.  When they arrived at Diana's residence at the Thorndike Apartments, Diana pointed out Windred's vehicle, which was still in the parking lot.  After talking to Diana about Windred's whereabouts, the officers either asked if they could do a probation search or advised him that they were going to do so; Diana responded "sure."  The court found that Diana's response was not a consent to the search, but rather a recognition of the officers' authority to conduct it.

[¶16]  Murray and Burtis then conducted a search lasting less than twenty minutes that consisted of looking in closets, under beds, and in some containers. Although they found a pillow that appeared to be bloodstained, they did not take the pillow with them when they left.  Burtis acknowledged at the suppression hearing that when he and Murray undertook the search they did not have any reason to believe that alcohol, drugs, or firearms would be found, but he did know that Windred had last been seen at Diana's apartment.

[¶17]  In *United States v. Knights*, the United States Supreme Court explained that a probationer has a "significantly diminished" expectation of privacy in comparison to an ordinary citizen, and partly for that reason a search conducted pursuant to a probation condition requires a lower standard of justification than the usual Fourth Amendment standard of probable cause. 534 U.S. 112, 119-21 (2001).  The Court articulated the test for assessing a warrantless probation search when a suspicion of wrongdoing exists: "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."[2]  *Id.* at 121; *see State v. Hutchinson*, 2009 ME 44, ¶ 24,

---

[2]  As the trial court noted, the *Knights* Court did not decide whether a completely suspicionless search of a probationer would be constitutional, *United States v. Knights*, 534 U.S. 112, 120 n.6 (2001), although

969 A.2d 923 (citing *Knights* in noting that convicted felons have a substantially reduced expectation of privacy concerning "governmental intrusions closely associated with [their] conviction").

[¶18]  Here, the record supports the court's finding that the probation search of Diana's apartment was justified by a reasonable suspicion that Diana had engaged in criminal activity connected to Windred's disappearance.  In addition to the reports from Savage, Walker, and Windred's ex-husband, Diana told Detective Burtis that (1) he was with Windred the previous day; (2) at about 5:00 p.m. Windred took a call and then laid down to rest; (3) an unknown friend called her at about 10:45 p.m. and she left fifteen minutes later, leaving her car behind with the dog inside and her son in Diana's care; and (4) she did not say how long she would be gone, only that she would be back before her son woke up.  Diana said that he too was concerned about Windred's welfare because she did not drink or go to bars, and he had called her cell phone at 3:00 a.m. and then called her house without reaching her.

[¶19]  The court found that Murray's and Burtis's reasonable suspicion of criminal activity sufficient to justify a warrantless search

> [was] revealed by the effort [they] initiated to conduct the search.  It is
> evident that they wanted to explore the defendant's potential

---

the Court later held that a suspicionless search of a parolee does not violate the Fourth Amendment, *Samson v. California*, 547 U.S. 843, 846, 857 (2006).  We need not decide that question here.

involvement in Windred's disappearance beyond simply asking him . . . . Rather, they secured authority from the defendant's probation officer to conduct the search, and they then carried out their plan.

[¶20] We agree. The information known to Murray and Burtis made their suspicion that Diana might be involved in Windred's disappearance objectively reasonable, and justified the probation search of Diana's apartment. *See Knights*, 534 U.S. at 121. Because the Fourth Amendment test is a purely objective one, the fact that at the time of the search the officers did not have a subjective belief that they would find alcohol, drugs, or firearms in the apartment in violation of Diana's probation conditions is irrelevant. *See Spencer v. Roche*, 659 F.3d 142, 149 (1st Cir. 2011) ("A police officer's subjective motive, even if improper, cannot sour an objectively reasonable search.").

B.     Jury Selection

[¶21] Diana contends that the court clearly erred in allowing a prospective juror to serve on the jury after she disclosed during individual voir dire that she had been a victim of domestic violence during a marriage that ended in 1972. The juror told the court that she had not been involved in any instances of assault or domestic violence since then, and she answered the court's questions by saying several times that she could be fair and impartial because she realized that each case is different and must be decided on its own merits. After the juror's voir dire ended, Diana challenged her for cause. The court denied the challenge, saying that

[s]he strikes me as being reflective and very thoughtful. I think a really good juror, to be honest. And she does have that background which was 40 years ago, but she got herself out of that situation. She said she's come to terms with it. She's a social worker now. I don't see a basis for a challenge for cause.

[¶22] The court's finding of juror impartiality is reviewed for clear error, and "will stand unless . . . no competent evidence supports that decision." *State v. Holland*, 2009 ME 72, ¶¶ 49, 52, 976 A.2d 227 (quotation marks omitted). Here, by interviewing the prospective juror individually, the trial court used the procedure that we have said should be employed when a juror's impartiality is questioned. *See id.* ¶ 53. Her assurance that she could be impartial "is significant to the court's determination as to whether [she could] in fact remain impartial." *Id.* ¶ 54.

[¶23] The court's finding that the challenged juror could be impartial is supported by competent record evidence and is therefore not clearly erroneous. That a prospective juror was once the victim of a crime, even if the crime is related to the charge brought against the defendant, does not *ipso facto* disqualify him or her from service on the panel. As the trial court recognized in its exemplary inquiry, the determination of a juror's fitness must be made on a case-by-case basis.

C.     Evidence Found in the Trash Area

[¶24]   Diana asserts that evidence found in a trash area at his apartment building should have been excluded at trial because of a defective chain of custody.  Alternatively, he contends that lay and expert testimony concerning the significance of a purple towel found in the trash area should have been excluded pursuant to M.R. Evid. 702.

1.     Chain of Custody

[¶25]   Asserting a defective chain of custody, Diana moved in limine to exclude evidence found by police in a white trash bag in a trash area outside his apartment building, which included a purple towel, a note with the word "Arnold" written on it, cigarette butts containing Diana's DNA, and a jacket from which hair and blood were recovered that was DNA-matched to Windred.  The motion was denied at a hearing.

[¶26]   Concerning any item of physical evidence, M.R. Evid. 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  We have said that

> [t]he central point of the chain of custody requirement is to assure that the evidence is what it purports to be—that is, related to the crime— and that it has not been contaminated or tampered with such that testing of it will yield unreliable (and therefore irrelevant) results.

. . . .

> [T]he temporal scope of the chain of custody depends on the context of the particular crime and the events surrounding the discovery and retention of the evidence in question.

*Cookson v. State*, 2011 ME 53, ¶ 17, 17 A.3d 1208.

[¶27]  We have also explained that "[a] break in the chain of custody of real evidence is relevant in assessing the weight of that evidence, but it does not inexorably affect admissibility."  *State v. Poirier*, 1997 ME 86, ¶ 4, 694 A.2d 448; *see* Field & Murray, *Maine Evidence* § 901.3 at 543 (6th ed. 2007) (stating that "the chain need [not] be ironclad in order to support admission of the evidence"; also stating that "a 'minor break' goes to the weight of the evidence rather than its admissibility").  The trial court's ruling that the chain of custody was sufficient is reviewed for clear error.  *Poirier*, 1997 ME 86, ¶ 4, 694 A.2d 448.

[¶28]  Here, the court found that the trash area was not locked, but it was enclosed by a privacy fence and marked with a "no trespassing" sign.  Sergeant Christopher Young of the Rockland Police Department assigned an officer to secure the trash area on the evening of November 21, and a cursory search to look for a body was performed while State Police detectives were interviewing Diana inside his apartment.  When the officers ended their search in the early morning hours of November 22, the privacy fence was left closed, but the area was unlocked and unguarded.

[¶29]  State Police Detective Jeffrey Love began a search of the trash area at 1:41 p.m. on the afternoon of November 22.  A Rockland police officer was watching the general area at the time.  Love randomly selected a white garbage bag, opened it, and saw a stained purple towel and a brown coat.  At that point he was called away to process other potential evidence.  No one was posted at the trash area when he left, and it was "pouring rain."  When Love returned the next day at 10:33 a.m. there were other detectives already searching the trash area; Love saw the bag that he had opened where he had left it.  State Police Detective Mark Holmquist was examining the coat, and Love saw the purple towel next to the bag.  Holmquist testified that when he came upon the bag within a few feet of the trash area gate, it was open and a purple towel was lying on top as Love said he had left it.  He described the search of the trash bag as "very methodical."

[¶30]  Given this record, although the chain of custody was not airtight, our standard that "by the fair preponderance of the evidence . . . it is more probable than not that the [challenged] object is the one connected with the case" was satisfied.  *Id.* ¶ 5 (quotation marks omitted).  Accordingly, it was not clear error for the trial court to find that the evidence found in the trash bag was admissible.

2.      Lay and Expert Testimony Concerning the Purple Towel

[¶31]  Maine State Police Sergeant William Ross testified at trial that on November 23, 2010, he was the evidence technician who collected and processed

16

the purple towel. Ross was later sent to where Windred's body had been found and saw that it was wrapped in a quilt secured by two strips of purple towel. Ross testified that the strips were "similar to the purple towel that we saw in the trash area behind [Diana's apartment] building."

[¶32] Diana did not object to Ross's testimony. Accordingly, our review is limited to obvious error. *See State v. Hassan*, 2013 ME 98, ¶ 25, 82 A.3d 86. None is demonstrated on this record because Ross did not opine that the strips actually came from the towel, but rather testified that as a police evidence technician the strips securing Windred's body had obvious significance to him because they were "similar to" the towel found at Diana's apartment building. The mere similarity of the strips to the towel was a factual observation that a lay witness could make. It was for the jury to determine the weight to give Ross's observation.

[¶33] Robert Burns, a State Police forensic specialist with ten years' experience, was prepared to testify as an expert that it was his opinion that the two strips wrapped around Windred's body came from the towel found in the trash area. Diana moved in limine to exclude Burns's opinion on the ground that no scientific or other reliable evidence linked the towel with the strips. The court held a hearing at which Burns described his training as a forensic specialist and his duties in the specific discipline of physical matching, which he described as

"looking at two or more . . . pieces of evidence to examine them for their characteristics to determine if at one time they were one item." Burns said that all of his casework is peer reviewed, and that he had testified as an expert concerning physical matching in two previous homicide cases. He explained the process of physical matching and why particular expertise is required to perform it. Specifically concerning the towel and strips, Burns said that he had conducted a visual examination lasting several hours, but pursuant to lab protocol he did not conduct any microscopic or chemical analysis.

[¶34] The court ruled that Burns's opinion was admissible pursuant to M.R. Evid. 702[3] because he possessed specialized knowledge, experience, and training that would assist the jury in assessing the towel evidence. Burns subsequently testified at trial that unique features in the torn edges of the towel and strips suggested that they were once one item, stating that "some jagged edges . . . could be matched back together. They fit into each other almost like a jigsaw puzzle."

[¶35] We review the court's ruling that Burns's opinion was admissible for an abuse of discretion. *See State v. Ericson*, 2011 ME 28, ¶ 12, 13 A.3d 777. In order for proffered evidence to qualify for admission pursuant to Rule 702, a court

---

[3] Maine Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

must find that it "meet[s] a threshold level of reliability," and that it "(1) is relevant in accordance with M.R. Evid. 401, and (2) will assist the trier of fact in understanding the evidence or determining a fact in issue." *Id.* ¶ 11 (quotation marks omitted). Indicia for determining reliability include "whether the hypothesis of the testimony has been subject to peer review," and "the nature of the expert's qualifications." *Id.* ¶ 12 (citation omitted).

[¶36] Here, if the jury determined that the towel located in the trash bag outside Diana's building belonged to him, then the question of whether the strips found tied around Windred's body came from that towel was directly relevant to the ultimate fact in issue—whether Diana had killed Windred. Burns's testimony at the hearing on the motion in limine supported the court's finding that he possessed specialized training and experience that could assist the jury in resolving that question. The weight to give Burns's opinion in light of his methodology was for the jury to decide; the court did not abuse its discretion in finding that the opinion met the threshold requirements for admission.

D.    Sentencing

[¶37] Diana asserts several errors in his appeal from the sentence imposed by the court. We address two, namely his contentions that the court (1) improperly considered Windred's son's proximity to her murder as an objective factor in determining a basic sentence, and then also considered the impact of her death on

her son as an aggravating subjective factor in arriving at a maximum sentence; and (2) imposed a basic sentence ten years too high when comparable cases are considered.[4] A criminal sentence is reviewed on appeal "for disregard of the relevant sentencing factors or abuse of the court's sentencing power. The sentencing power referred to is exercised through the application of the three-step process set out in 17–A M.R.S. § 1252–C [(2013)], except in the case of murder, when only the first two steps apply."[5] *Ormsby*, 2013 ME 88, ¶ 35, 81 A.3d 336 (footnote and quotation marks omitted).

[¶38] Considering the first of Diana's challenges, we have held that

[p]lacing children close to a scene of violence or murder obviously exposes them to risk of physical harm. In addition, children who witness such horrific violence also face adverse neurological, psychological, and developmental consequences. Creating such a

---

[4] Diana also contends that the court erred in finding that his hands were used as a deadly weapon in killing Windred because she was manually strangled, and in failing to place sufficient weight on mitigating factors. We have fully considered his arguments on those issues, discern no error, and do not discuss them further.

[5] Title 17-A M.R.S. § 1252-C (2013) provides, in part:

In imposing a sentencing alternative pursuant to section 1152 that includes a term of imprisonment relative to murder, a Class A, Class B or Class C crime, in setting the appropriate length of that term . . . , the court shall employ the following . . . process:

**1.** The court shall first determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the offender.

**2.** The court shall next determine the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case. These sentencing factors include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest.

> severe collateral impact on children is an aggravating circumstance
> that could raise a defendant's homicidal conduct to "most serious."

*State v. Waterman*, 2010 ME 45, ¶ 46, 995 A.2d 243; *see State v. Nichols*, 2013 ME 71, ¶ 28, 72 A.3d 503 (noting that an appropriate factor in step one of the court's sentencing analysis was the fact that a murder "occurred near the couple's son" and partly for that reason "the seriousness of the murder was greater in comparison to other ways it could have been committed").

[¶39]  In determining a basic sentence here, the court properly considered the objective fact of Windred's son's proximity to the crime because it was relevant to its assessment of the manner in which the crime was committed.  When Diana killed Windred he knew that her young son was downstairs waiting for her in the car.  It was only through good fortune, not Diana's actions, that the boy did not enter the apartment and witness his mother's murder and suffer whatever response his appearance might have provoked on the part of Diana.  Diana then involved Windred's son in the crime scene for hours after her murder, including having him sleep in the same room near her corpse.  It is probable that the boy's knowledge of what occurred, even after the fact, will in the future have the same "severe collateral impact" that we condemned in *Waterman*.  2010 ME 45, ¶ 46, 995 A.2d 243.

[¶40]   Contrary to Diana's contention, after setting the basic sentence at forty years, the court did not double-count the impact of Windred's murder on her son in arriving at a maximum sentence of forty-five years.  The court clearly and carefully separated the *objective* fact that Diana involved the boy in the crime, properly considered in step one in assessing the manner in which the crime was committed, from the crime's *subjective* impact, which the court found to be "the ongoing trauma that will be with [Windred's son] forever" as a result of his knowledge that he was nearby when his mother was murdered, and in the same room with her corpse for an extended period after her death.  The subjective impact of Diana's conduct on Windred's son was an aggravating factor properly considered in step two of the sentencing analysis.[6]

[¶41]   Finally, Diana contends that the court's basic sentence of forty years was ten years too high when the facts of this case are considered alongside comparable cases.  Although Diana offered four cases for comparison in his sentencing memorandum to the trial court, the court did not expressly consider comparable cases.  However, as we have said before, Diana's argument

---

[6] It would have been error for the court to consider the subjective impact of Windred's death on her son in setting a basic sentence. *See State v. Nichols*, 2013 ME 71, ¶ 14, 72 A.3d 503 ("The first step of the statutory sentencing process requires that the court review the facts and nature of the crime and the conduct in committing the crime in as objective a manner as possible . . . .").  Therefore, in order to accept Diana's argument that the boy's proximity to the murder could not be considered in step one because the traumatic impact it actually had on him was considered in step two, we would have to conclude that in objectively analyzing the manner in which the murder was committed it made no difference whether the boy was present when his mother was killed or not.  We reject that argument.

reflect[s] a popular, but mistaken, belief that the statute requires the court to consider comparable sentences as part of the first step of the statutory sentencing process established in 17-A M.R.S. § 1252-C(1). It does not. While it is permissible for the sentencing court to consider comparable sentences at the first step if appropriate, neither the statute nor our case law mandate it.

*Nichols*, 2013 ME 71, ¶ 20, 72 A.3d 503.

The entry is:

Judgment and sentence affirmed.

---

**On the briefs:**

Jeremy Pratt, Esq., Camden, for appellant Arnold Diana

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Jeremy Pratt, Esq., for appellant Arnold Diana

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine

Knox County Superior Court Docket number CR-2010-345