MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2021 ME 12
Docket:       Pen-20-18
Argued:       February 10, 2021
Decided:      March 16, 2021

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

## STATE OF MAINE

v.

## PHILIP L. CLARK

JABAR, J.

[¶1]   Philip L. Clark appeals from a judgment of conviction for intentional or knowing murder, 17-A M.R.S. § 201(1)(A) (2020), entered in the Unified Criminal Docket (Penobscot County, *Stokes, J.*) following a jury trial.  He contends that the court erred in refusing to instruct the jury on the affirmative defense of adequate provocation, as set forth in 17-A M.R.S. § 201(3) (2020).  He also contends that the court erred in denying his motion to suppress multiple confessions and abused its discretion by denying his motion to recuse the presiding Justice.[1]  We affirm the judgment and sentence.

---

[1]  He also contends the court abused its discretion when setting his final sentence and violated the constitution by not setting his basic sentence at or near the mandatory minimum of twenty-five years.  We do not find these arguments persuasive and do not discuss them further.

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt.  *See State v. Ouellette*, 2019 ME 75, ¶ 11, 208 A.3d 399.  On July 11, 2018, Philip L. Clark fired several shots at his sister-in-law, Renee Clark, stopped to reload, and continued to fire his gun until Renee stopped moving.  Renee, who was forty-nine years old at the time of her death, was involved in a contentious divorce with her husband and Philip's brother, Frank Clark.

[¶3]  The shooting took place in a former convenience store that had been converted into adjoining apartments on Kennebec Road in Hampden.  On the first floor, Renee and Frank lived in one apartment and Philip lived in the other apartment.

[¶4]  In April 2018, as the marriage between Frank and Renee was coming to a contentious end, Renee moved out of the Kennebec Road apartment and into a home in Etna[2] with her friend, a priest.  On June 15, 2018, Renee obtained a temporary order for protection from abuse order against Frank.  The order required Frank to move out of the Kennebec Road

---

[2]  After moving into the home in Etna, Renee did not sleep at the Kennebec Road apartment again because "the fear she had of [Frank] and Phil was paralyzing," although she went to the Kennebec Road apartment frequently to retrieve her property.

apartment. Because the order did not apply to Philip, he was allowed to remain in his apartment. On the same day the protection order was issued, Renee and the priest went to the Kennebec Road property to retrieve what Renee believed to be marital assets and found that various items, including her computer, were missing. Philip later entered a storage area of the apartment and saw that his work tools were missing. Philip called the police to report his tools missing, and when the police arrived, Renee informed them that Philip was trespassing. The officer charged Philip with criminal trespass and this upset Philip.

[¶5] Renee was fearful of Frank and Philip. As a result, she pushed a rack in front of a door that led from Philip's apartment to hers and she put up no-trespassing signs. On the day of the murder, Frank dropped Philip off at the Kennebec Road property while Renee and the priest were in their cars in the driveway. Philip and the priest got into a heated argument, and a physical fight ensued over Philip's missing work tools and Renee's missing computer. The police were called, with each party blaming the other for starting the fight. Because of the conflicting statements, neither Philip nor the priest was charged. The priest inflicted several injuries on Philip, including a broken rib, a contusion near his kidney, and a cut on his forehead.

[¶6]   Renee left the apartment after the fight but returned later that night to remove a license plate from a Jeep she owned with Frank.  Renee began talking to her mother on the telephone in her apartment.  Philip claimed that because of the thin walls in the apartment building, he could hear Renee laughing about his fight with the priest during her phone call and as a result he became enraged.  Philip then went into Renee's side of the apartment building, carrying a gun, and asked Renee if she thought it was funny that he had been beaten up; she replied that she thought it was hilarious.  Philip then shot Renee multiple times, reloaded his gun, and continued to shoot her until she was dead.[3]

[¶7]  The day after her death, Renee's mother called the police because she could not reach her daughter.  An officer went to the Kennebec Road property and knocked on the doors with no response.  The police attempted for hours to contact anyone in the Kennebec Road property.  From approximately 4:52 p.m. until Philip finally came out at 12:45 a.m., the police, with the assistance of the Maine State Police Major Crimes Unit, attempted to contact Renee or Philip by knocking on the windows and doors.  In the early

---

[3]  Philip cleaned up the crime scene, wrapped her body and bloody bed sheets in plastic, collected the shell casings, and then went to sleep.  The following day, July 12, 2018, Philip drove Renee's car to the Airport Mall in Bangor, left it in the parking lot, threw her keys into the river, and took a bus home.  As he was walking to the bus station he thought about turning himself in at the jail, but he instead went home to sleep.

morning of July 13, 2018, at about 12:45 a.m., Philip answered the door and told the local officer at the door, "You know I killed her so . . . ." A State Police detective heard him say that, approached him, and asked him to accompany him to the Hampden Police Department to be interviewed.

[¶8] At the police station, Philip confessed to killing Renee. He said that he was in a rage and that she pushed all his buttons. He told the police where Renee's body was and said that he had put the gun in a safe after the shooting. Officers went inside Renee's apartment and found her body exactly where Philip had described. Her body was taken to the Medical Examiner's Office for an autopsy, which determined that the cause of Renee's death was multiple gunshot wounds.

## II.  PROCEDURAL HISTORY

[¶9] On July 26, 2018, Philip was charged with one count of intentional or knowing murder, in violation of 17-A M.R.S. § 201(1)(A). After being indicted by the Penobscot County Grand Jury, Philip pleaded not guilty to the charge.

[¶10] On February 12, 2019, Philip filed a motion to suppress his confession to law enforcement. Specifically, Philip sought to suppress statements he made to the police at his residence in Hampden, during the

6

early hours of July 13, 2018, as well as his post-*Miranda* statements that he made at the station later that day. A two-day testimonial hearing was held on the motion. The court (Penobscot County, *Anderson, J.*) denied the motion. The court found that Philip was not in custody at the time he made his statements to police upon exiting the home in the early morning of July 13, 2018, and that the statements were voluntary beyond a reasonable doubt. The court further found that Philip's statements and confession to law enforcement at the police station on July 13, 2018, were voluntary beyond a reasonable doubt and that the State proved by a preponderance of the evidence that Philip knowingly and intelligently waived his *Miranda* rights.

[¶11] Between November 12 and 14, 2019, the court (*Stokes, J.*) held jury selection for Philip's trial. On the first day of jury selection, the trial judge informed the parties that he knew one of the witnesses, the priest. The trial judge stated that he was not friends with the priest but had met him three to four years earlier when the priest was a seminarian at an Augusta church for the summer. The trial judge was a lector in that church at the time and stated that they had conversations three times, ranging from a discussion of the trial judge's work as mayor of Augusta to a discussion of growing up in the same part of Massachusetts. Additionally, the trial judge disclosed that during his

prior prosecutorial career with the Attorney General's office, he had worked with the prosecutors in the case and that he had hired and supervised them. Philip asked the trial judge to recuse himself because of his prior relationship with the prosecutors and his prior relationship with the priest, whom the defense described as "central to and, simultaneously, hostile to the defense." The trial judge denied the recusal request.

[¶12]   At trial, Philip tried to establish the defense of adequate provocation to obtain a conviction for manslaughter rather than murder. Philip called the priest as a witness in an attempt to demonstrate that he had been provoked by a pattern of conduct that the priest and Renee had engaged in over the weeks preceding the killing.  Philip also called as a witness a doctor who opined that, at the time of the shooting, Philip was in a state of hyperarousal and had a concussion from his fight with the priest.  Based on this testimony and the events leading up to the murder, including the beating that Philip suffered from the priest, Philip requested a jury instruction on adequate provocation, 17-A M.R.S. § 201(3), which the court denied.  The court determined that the evidence did not generate the affirmative defense of adequate provocation.  Following a seven-day jury trial, the jury returned its verdict finding Philip guilty of murder.

[¶13]  On January 7, 2020, the court imposed a forty-three-year term of imprisonment.

[¶14]  On January 8, 2020, Philip filed a notice of appeal from the conviction pursuant to M.R. App. P. 2(b)(1) and 15 M.R.S. § 2115 (2020), as well as a separate application to appeal his sentence pursuant to M.R. App. P. 20 and 15 M.R.S. § 2151 (2020).  On March 6, 2020, the Sentence Review Panel issued an order granting the application for leave to appeal the sentence.  *See State v. Clark*, No. SRP 20-19 (Me. Sent. Rev. Panel Mar. 6, 2020).

### III.  DISCUSSION

A.    Adequate Provocation Jury Instruction

[¶15]  Philip contends that the court erred in refusing to instruct the jury on the affirmative defense of adequate provocation.  17-A M.R.S. § 201(3). He asserts that Renee's provocation of him was two-fold: her mistreatment of him and her laughing on the phone just prior to the shooting.

[¶16]  "We review jury instructions as a whole for prejudicial error, and to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law."  *State v. Tucker*, 2015 ME 68, ¶ 11, 117 A.3d 595 (quotation marks omitted).  Because the claimed error here is the denial of a particular instruction on adequate provocation, we will vacate the

9

judgment only "if the appellant demonstrates that the requested instruction (1) stated the law correctly; (2) was generated by the evidence; (3) was not misleading or confusing; and (4) was not sufficiently covered in the instructions the court gave. In addition, the court's refusal to give the requested instruction must have been prejudicial to the requesting party." *State v. Hanaman*, 2012 ME 40, ¶ 16, 38 A.3d 1278 (citation omitted).

[¶17] Title 17-A M.R.S. § 201 (2020) provides, in relevant part,

> 3. [I]t is an affirmative defense to a prosecution under subsection 1, paragraph A [i.e., intentional or knowing murder] that the person causes the death while under the influence of extreme anger or extreme fear brought about by adequate provocation.

> 4. [F]or purposes of subsection 3, provocation is adequate if:
> A. It is not induced by the person; and

> B. It is reasonable for the person to react to the provocation with extreme anger or extreme fear, provided that evidence demonstrating only that the actor has a tendency towards extreme anger or extreme fear is not sufficient, in and of itself, to establish the reasonableness of the person's reaction.

Because it is an affirmative defense, adequate provocation "must be proved by the defendant by a preponderance of the evidence." 17-A M.R.S § 101(2) (2020).

[¶18]  To determine if the affirmative defense of adequate provocation is generated by the evidence, we have said,

> "[I]t is the [trial] court, in the first instance, that must determine whether the evidence is legally sufficient to generate the adequate provocation manslaughter defense.  Viewing the evidence in a light most favorable to the defendant, the court must determine as a question of law whether there is any evidence from which the jury could find provocation and other elements that would reduce the offense to manslaughter.  The test for measuring the sufficiency of the evidence is whether a jury could rationally have found that the defense was established by a preponderance of the evidence."  A court makes that determination in light of [this Court's] observation that "[t]here are few instances when we have recognized conduct as being sufficient to engender extreme anger or fear and mitigate the conduct of a defendant."  That is so, in part, because the victim's provocation must be "of such a nature that [the defendant's] reaction to it with extreme anger or extreme fear was objectively reasonable."

*State v. Kimball*, 2016 ME 75, ¶ 10, 139 A.3d 914 (quoting *Hanaman*, 2012 ME 40, ¶¶ 18, 20, 23, 38 A.3d 1278).  In this case, Philip states that the moment of provocation that we should focus on is "when Renee returned to her apartment and began loudly joking about a priest assaulting Philip."  Philip further contends that if there "is any evidence by which a jury could conclude that Renee herself induced the confrontation, then the defense would be allowed."

[¶19]  Here, Philip was upset with Renee about missing tools, the removal of his brother from the property, the fight Philip had with the priest,

and Renee laughing on the phone in her apartment. Knowing that he was upset about these issues with Renee, Philip armed himself and trespassed into Renee's apartment. In the apartment, Philip asked Renee if she thought it was funny that he had been beaten up, inducing Renee's comment, "I think it's hilarious [that the priest beat you up]," which caused him to shoot Renee, reload, and shoot her until she stopped moving.

[¶20] "[I]t is well-settled that 'mere words' will not suffice" to engender extreme anger or fear and mitigate the conduct of the defendant. *State v. Cumming*, 634 A.2d 953, 957 (Me. 1993) (quoting *State v. Michaud*, 611 A.2d 61, 63 (Me. 1992)) (stating that provocation must be so close in time that the heat of passion had not cooled); *see also State v. Warmke*, 2005 ME 99, 879 A.2d 30 (upholding the denial of an adequate provocation instruction where there was evidence that the defendant went to the property of the victim and shot her because of prior verbal mistreatment by her and a smirk at the defendant just prior to the shooting); *see also State v. Lockhart*, 2003 ME 108, ¶ 42, 830 A.2d 433 (explaining that evidence of a heated argument with a victim, during which the victim was slapping and hitting defendant, was insufficient to generate an adequate provocation instruction).

[¶21] Philip "had the burden of proving that he did not instigate or create the event that ultimately provoked him to commit the crime." *State v. Pulsifer*, 1999 ME 24, ¶ 15, 724 A.2d 1234. Here, the trial court correctly determined that the evidence did not generate the issue of adequate provocation. The court found that Philip induced the provocation that Philip claimed led to the killing "by going next door to confront her about what he believed was her laughing" at him on the phone.

[¶22] Furthermore, the missing work tools and the fight with the priest hours before the shooting do not contribute to bringing Renee's laughing in her own apartment to the level where it was "of such a nature that [the defendant's] reaction to it with extreme anger or extreme fear was objectively reasonable." *Hanaman*, 2012 ME 40, ¶ 20, 38 A.3d 1278.

[¶23] The trial court did not err in determining that, based on the evidence at trial, a jury could not rationally have found that the affirmative defense was established by a preponderance of the evidence. Therefore, we conclude that the court was correct in holding that the jury instruction for adequate provocation was not generated by the evidence.

B.      Motion to Suppress[4]

[¶24]   Philip contends that the court erred by denying his motion to suppress the statements that he made to law enforcement at his residence on the grounds that the statements were not voluntary and were obtained while he was in custody but had not been read *Miranda* rights.  He contends that he was in custody and that the statements were involuntary due to the lengthy police presence outside his home.  Additionally, Philip contends that his involuntary statements to the police at his residence irreparably tainted his confession and that this taint cannot be removed by later *Miranda* warnings at the police station.

[¶25]   We apply a two-tiered standard of review to examine a trial court's denial of a motion to suppress: "the court's factual findings are reviewed for clear error and its application of legal principles to those findings is reviewed de novo."  *State v. Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595; *see also State v. Lavoie*, 2010 ME 76, ¶ 13, 1 A.3d 408 (stating that when the

---

[4] Philip also contends that the court abused its discretion by denying his motion in limine to exclude, as unfairly prejudicial, his own characterization, during his confession to police, of the shooting as a "murder."  We review the trial court's admission of evidence over a Rule 403 objection for an abuse of discretion.  *See State v. Michaud*, 2017 ME 170, ¶ 8, 168 A.3d 802; M.R. Evid. 403. Philip's statement to the police was strongly probative of his state of mind as Philip was explaining that he did not attempt to cover up the body because right after the shooting he knew he was not going to get away with murder.  We conclude that the trial court did not abuse its discretion in admitting Philip's characterization of his shooting of Renee as murder.

14

court's factual findings are undisputed, a challenge to the application of constitutional protections to those facts is a matter of law that we review de novo). We "will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Diana*, 2014 ME 45, ¶ 11, 89 A.3d 132 (quotation marks omitted).

1. Custody

[¶26] Philip first contends that the six hours of intense police presence outside his home prior to when he exited his residence and confessed rendered him in custody. "The determination of whether an individual was in custody is a mixed question of fact and law." *State v. Lowe*, 2013 ME 92, ¶ 13, 81 A.3d 360 (quotation marks omitted). In reviewing a court's custody determination, we defer to the trial court's factual determinations but review de novo the determination of whether an individual was in custody. *State v. Jones,* 2012 ME 126, ¶ 21, 55 A.3d 432.

[¶27] To determine if a person was "in custody" for *Miranda* purposes, "a court must objectively review the pertinent circumstances to decide whether a reasonable person in the defendant's position would have felt free to terminate the interaction with law enforcement or if there was a restraint on freedom of movement of the degree associated with formal arrest." *State v.*

*Perry*, 2017 ME 74, ¶ 15, 159 A.3d 840 (quotation marks omitted). In conducting this analysis, the court considers a number of factors.[5] *Id.*

[¶28]  Here, the court (*Anderson, J.*) found that while there were a few circumstances present that could weigh in favor of custody, there were many factors that suggested that Philip was not in custody. The factors that the court found weighed against a finding that he was in custody included that (1) Philip made the statements in a familiar location, on the front steps of his residence; (2) the officers never made any indication that they had probable cause to arrest Philip, and they had no reason to know that they would ultimately obtain probable cause to arrest him; (3) there was no physical restraint; (4) it was Philip, upon his own volition, who exited the building; and (5) the officers were nonconfrontational, compassionate, and polite with Philip when he admitted to shooting Renee. The court also found that the police presence was not without context. Philip had been involved in a

---

[5]  The factors include "(1) the locale where the defendant made the statements; (2) the party who initiated the contact; (3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant); (4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave; (6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it); (7) whether the suspect was questioned in familiar surroundings; (8) the number of law enforcement officers present; (9) the degree of physical restraint placed upon the suspect; and (10) the duration and character of the interrogation." *State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222.

16

serious physical altercation with the priest the previous day, and the officers wanted to make sure that he was okay. Additionally, the officers wanted to locate Renee, not having any reason to believe that she was dead, let alone that Philip was responsible for her death.

[¶29] The mere fact that there were multiple officers attempting to conduct a well-being check of Philip and Renee did not mean that Philip was "in custody" for *Miranda* purposes. *See, e.g., State v. Leonard*, 2002 ME 125, ¶¶ 9, 10, 802 A.2d 991 (affirming the finding that the defendant was not in custody where the police were looking for the defendant at his home because they had reason to believe he had committed a crime, many officers were present, and an armed standoff occurred); *see also State v. Powell,* 640 A.2d 209, 210-211 (Me. 1994) (affirming the finding that the defendant was not in custody when multiple officers questioned defendant while executing a search warrant). The court did not err in concluding that Philip was not in custody when he confessed to killing Renee outside his own residence. Because the court properly determined that Philip was not in custody, the determination of whether follow-up questions asked by the police at his residence after Philip confessed amounted to interrogation is not necessary. *State v. Holloway*, 2000 ME 172, ¶ 13, 760 A.2d 223 (stating that *Miranda* warnings

are required only when a defendant is both in custody and subject to interrogation).

2.    Voluntariness

[¶30]   Philip next contends that his statements to police should have been suppressed because they were not voluntary.

[¶31]   When a confession is not "forced" out of a defendant, the confession will be examined to determine whether the defendant's statements "were free and voluntary or whether, considering the totality of the circumstances under which the statements were made, their admission would be fundamentally unfair," in violation of due process. *State v. Hunt*, 2016 ME 172, ¶ 19, 151 A.3d 911.

[¶32]  We have determined that

[t]he voluntariness requirement gives effect to three overlapping but conceptually distinct values: (1) it discourages objectionable police practices; (2) it protects the mental freedom of the individual; and (3) it preserves a quality of fundamental fairness in the criminal justice system.

*Id.* ¶ 20.   Courts consider the totality of the circumstances in making a voluntariness determination, including the following factors:

[t]he details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery;

> threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct.

*State v. George*, 2012 ME 64, ¶ 21, 52 A.3d 903 (quotation marks omitted).

[¶33] Here, the court concluded beyond a reasonable doubt, based on the totality of the circumstances, that Philip's statements to the police were voluntary.[6] The court found that although Philip's physical health was somewhat diminished as a result of the fight with the priest, the court found there was no indication that his mental health was actually diminished. Additionally, the court found that the actions Philip took before the police arrived demonstrated that his conduct, including cleaning up the crime scene and getting a full night's sleep before driving Renee's car to Bangor, was deliberate.

[¶34] We review the trial court's factual determinations on a question of voluntariness for clear error. *Bryant*, 2014 ME 94, ¶ 15, 97 A.3d 595. "Clear error exists if a finding is unsupported by competent evidence in the record." *Boyd v. Manter*, 2018 ME 25, ¶ 9, 179 A.3d 906. Here, the trial court's finding

---

[6] The court focused on Philip's interaction with police on his doorstep and found that it was brief; it was not custodial; the police did not engage in any trickery; the police were cordial; the police were there to check on Philip's well-being due to his altercation with the priest; and Philip appeared emotionally stable during his interaction with police.

that Philip's statements were voluntary is supported by the evidence of the voluntary nature of his actions after the shooting.

[¶35]  We conclude that the trial court did not err in determining that Philip's statements were voluntary.

C.     Recusal

[¶36]  Philip contends that the trial court abused its discretion by denying his motion to recuse based on the trial court's prior relationship with the prosecutors in the case and with a witness.

[¶37]  We review the decision on a motion to recuse for abuse of discretion, because "the trial court's decision to recuse is within its sound discretion." *Yarcheski v. P&K Sand & Gravel, Inc.*, 2015 ME 71, ¶ 7, 117 A.3d 1047 (quotation marks omitted).  "[A] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is."  *State v. Dechaine*, 2015 ME 88, ¶ 44, 121 A.3d 76 (quotation marks omitted). Pursuant to the Maine Code of Judicial Conduct, a judge must recuse himself on a motion made by any party if his "impartiality might reasonably be questioned" or if he has a "personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding."

*DeCambra v. Carson*, 2008 ME 127, ¶ 8, 953 A.2d 1163; *see also* M. Code Jud. Conduct R. 2.11.

[¶38]  Here, before jury selection began, the trial judge promptly disclosed to the parties all facts known to him that were relevant to the question of impartiality, stating that (1) he had worked with, and had been the supervisor of, the prosecutors in the case prior to being appointed to the bench in 2014, and (2) he knew a witness because three to four years prior to the trial, the witness had been a seminarian intern for one summer at the church that the trial judge attended, and during that summer he had roughly three conversations with him.  The judge stated, "I have no concerns whatsoever that that would affect my ability to be fair, impartial, and objective in this case."

[¶39]  Regarding the prosecutors, the trial judge stated, "[I]t's not a problem for me.  I don't feel in any way, shape or form that [the prior work relationship] impacts my ability to be fair and impartial in this case."

[¶40]  As a result of these disclosures, on the following day, Philip asked the trial judge to recuse himself.  The court denied the motion and confirmed that none of the standards of the Maine Code of Judicial Conduct Rule 2.11, pertaining to recusal, required his recusal.  The court further stated, "[I]t's an

abuse of discretion for the Court to recuse itself when there's no basis for it . . . . I just don't see the basis for it."

[¶41]   A party's "mere belief" that a judge might not be completely impartial is insufficient to warrant recusal if the judge believes that he can act with complete impartiality. *Johnson v. Amica Mut. Ins. Co.*, 1999 ME 106, ¶ 11 n.1, 733 A.2d 977.  Looking at the record as a whole, the fact that the presiding judge had met the witness years before on a few Sundays during one summer was insufficient to create even an appearance of bias.  Additionally, the trial judge had presided over several homicide trials involving the Attorney General's office prior to this case and has not worked in the Attorney General's office for over five years.

[¶42]   We conclude that the trial court did not abuse its discretion in denying Philip's motion to recuse.

The entry is:

Judgment and sentence affirmed.

David W. Bate, Esq., Bangor, and Logan E. Perkins, Esq. (orally), Perkins Law Office, Belfast, for appellant Philip L. Clark

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2018-2736
FOR CLERKS REFERENCE ONLY