MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2017 ME 74
Docket:        Yor-16-290
Argued:        March 2, 2017
Decided:       April 25, 2017

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

LEE PERRY

JABAR, J.

[¶1]  Lee Perry appeals from a judgment of conviction entered by the trial court (York County, *Douglas, J.*) after a jury found him guilty of three counts of aggravated assault (Class B), 17-A M.R.S. § 208(1) (2016); two counts of domestic violence assault (Class D), 17-A M.R.S. 207-A(1)(A) (2016); and one count each of domestic violence criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. 209-A(1)(A) (2016), and domestic violence reckless conduct with a dangerous weapon (Class C), 17-A M.R.S. § 211-A(1)(A) (2016).  He also challenges the consecutive sentences imposed for two of the convictions.  We affirm the judgment and sentences.

## I. BACKGROUND

[¶2] Viewing the facts in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Hurd*, 2010 ME 118, ¶ 4, 8 A.3d 651. At the time of the events in question, the victim and the defendant, Lee Perry, were sexual partners residing together at an apartment in North Berwick. On the afternoon of December 5, 2014, the victim and Perry engaged in a verbal altercation after the victim accused Perry of taking money and prescription medications from her purse. At some point during the altercation, the victim attempted to walk away from Perry and, when she turned her back to do so, Perry shoved her to the ground, causing the victim to injure her wrist when she extended her arm to break her fall.

[¶3] Shortly after the shoving incident, Perry went into the bedroom to take a nap. When Perry awoke, the altercation reignited, and Perry grabbed the victim and threw her to the ground. While the victim was face down on the apartment floor, Perry grabbed her around her neck and began tightening his grip, inhibiting her ability to breathe. Perry continued applying pressure to the victim's neck until she lost control of her bowels and bladder. Perry

eventually stopped, and the victim pulled herself off the ground and went into the bathroom to take a shower and change her clothes.

[¶4]  While the victim was in the shower, Perry broke the lock on the bathroom door, grabbed the victim by her hair, and slammed her head against the bathroom wall and the toilet basin.  Perry then proceeded to pull the victim out of the bathroom on her hands and knees.  While the victim was on the floor, Perry grabbed a knife and threatened to kill her, remarking that "12 to 14 [years in prison] don't look too bad about now."  To defend herself, the victim raised her hand to deflect the blade and suffered lacerations on her hand.

[¶5]  The victim eventually left the apartment she shared with Perry and went upstairs to a friend's apartment.  Initially, the victim did not want to contact the authorities; only after she saw the extent of her injuries in the mirror did she decide to place a call to a friend and ask that the friend call the police.

[¶6]  In the early morning hours of December 6, 2014, an officer from the North Berwick Police Department received a call reporting a domestic disturbance.  Accordingly, he responded to the victim's apartment and was joined shortly thereafter by another officer.  When the officer arrived, he was

4

greeted by the victim, who bore visible injuries. The victim informed him that she and Perry had been involved in an altercation and that Perry had physically assaulted her. Based on this conversation and in accordance with "standard police protocol" the officer then went to speak with Perry. While the other officer remained outside, the victim led the first officer into the apartment and the room in which Perry was sleeping. The first officer woke Perry by announcing his presence as a police officer. The first officer proceeded to ask Perry a series of questions about what had transpired earlier that evening and if he had been drinking. Perry admitted that he and the victim had argued earlier but denied hurting her or knowing how she received her injuries. Perry also admitted that he drank four or five beers that evening. At no time during this exchange was Perry advised of his *Miranda* rights. After hearing Perry's responses, the first officer left Perry in the bedroom and reunited with the other responding officer outside of the apartment. At that time, the first officer expressed to the other officer his intent to arrest Perry. The first officer then re-entered the apartment and placed Perry under arrest.

[¶7] On March 2, 2015, the State filed a seven-count indictment against Perry. Three of the seven counts alleged aggravated assault based on separate and distinct episodes of alleged criminal conduct in violation of three distinct

provisions of the Criminal Code. Count I alleged aggravated assault in violation of 17-A M.R.S. § 208(1)(A). Count II alleged aggravated assault causing bodily injury under circumstances manifesting extreme indifference to the value of human life. 17-A M.R.S. § 208(1)(C). Count III alleged aggravated assault causing bodily injury with a dangerous weapon. 17-A M.R.S. § 208(1)(B).

[¶8] A three-day jury trial on the indictment commenced on May 24, 2016. Prior to trial, Perry moved the court to suppress statements he made to the first officer before his arrest. After a hearing, the court (*Douglas, J.*) denied the motion, concluding that Perry was not in custody for *Miranda* purposes during the interview and therefore the statements were admissible at trial.

[¶9] At trial, the State elicited testimony from various individuals describing the extent of the victim's injuries, which included a broken wrist requiring surgery and a laceration on her right hand. In addition, the victim testified to the symptoms and injuries she experienced during and after Perry strangled her on the floor of the apartment, namely incontinence, nausea, blurred vision, headache, and neck pain. Over Perry's objection, the State also presented the testimony of a strangulation expert who provided the technical definition of "strangulation," specifically as it differs from the colloquial term

6

"choking," and described the physiological effects and symptoms of strangulation.

[¶10] Relying upon the testimony summarized above, the State, in both its opening statement and closing argument, explained to the jury that Count I of the indictment, aggravated assault, pertained to Perry's shoving of the victim that resulted in her breaking her wrist; that Count II, aggravated assault with extreme indifference to the value of human life, pertained to Perry's strangulation of the victim; and that Count III, aggravated assault with a dangerous weapon, pertained to Perry's use of the knife to cut the victim's hand.

[¶11] After a brief deliberation, the jury returned a guilty verdict on all counts. With regard to the aggravated assault charges, the court sentenced Perry as follows:[1]

- Count I, aggravated assault: four years' imprisonment to be served concurrently with Count II;
- Count II, aggravated assault: nine years' imprisonment;

---

[1] On the remaining counts, Perry was sentenced as follows: Count IV, criminal threatening, three years' imprisonment; Count V, domestic violence assault, 270 days' imprisonment; Count VI, domestic violence, reckless conduct with a dangerous weapon, three years' imprisonment; and Count VII, domestic violence assault with a dangerous weapon, three years' imprisonment. Although the crime charged in Count VII, domestic violence assault, is a Class D crime carrying with it a maximum term of imprisonment of less than one year, the State, pursuant to 17-A M.R.S. § 1252(4) (2016), sought an elevated sentence because of Perry's use of a dangerous weapon during the commission of the crime. Sentences for the aforementioned charges were ordered to be served concurrently with the sentence imposed on Count II.

- Count III, aggravated assault: five years' imprisonment, all suspended, and four years' probation, *to be served consecutively to Count II.*

## II. DISCUSSION

[¶12] Perry now appeals, arguing that the court erred in denying his motion to suppress and abused its discretion in allowing the State to present expert testimony on strangulation. He also sought and obtained leave to appeal his sentence.

### A. Motion to Suppress

[¶13] Perry first argues that the court erred in denying his motion to suppress statements he made to the first officer prior to his arrest. Specifically, he argues that these statements should have been suppressed because, when he spoke with the first officer in the early morning hours of December 6, he was in custody and had not been apprised of his *Miranda* rights.

#### 1. Standard of Review

[¶14] When addressing a challenge to a court's denial of a motion to suppress, we review the motion court's factual findings for clear error and its legal conclusions de novo. *See State v. Cote*, 2015 ME 78, ¶ 9, 118 A.3d 805. We treat the determination of whether a person was in custody for *Miranda*

purposes as a mixed question of law and fact. *State v. Dion*, 2007 ME 87, ¶ 22, 928 A.2d 746.

> 2. Custody Determination

[¶15] When a person has been subjected to an in-custody interrogation but has not been advised of his *Miranda* rights, the State may not offer the statements made during that interrogation against that person in its case-in-chief. *State v. King*, 2016 ME 54, ¶ 16, 136 A.3d 366. To determine if a person was "in custody" for *Miranda* purposes, a court must objectively review the pertinent circumstances to decide whether a reasonable person in the defendant's position would have felt free to terminate the interaction with law enforcement or if there was a "restraint on freedom of movement of the degree associated with formal arrest." *State v. Holloway*, 2000 ME 172, ¶ 14, 760 A.2d 223 (quotation marks omitted). In conducting this analysis, a court may consider a number of factors, including

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a

reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222.

[¶16] Here, the court did not err in concluding that Perry was not in custody for *Miranda* purposes when he spoke with the first officer in the early morning hours of December 6. Although the court found that the first officer initiated contact with Perry, awaking him in his bedroom and announcing his presence as a police officer—a fact that weighs in favor of a finding of custody—the record amply supports the court's conclusion that Perry was not in custody at that time. Specifically, the Court found that the questioning was conducted by a single officer in circumstances familiar to Perry; Perry was

never physically restrained; the questioning by the first officer was brief; and, although at some point in his investigation the first officer formulated an intent to place Perry under arrest, he never manifested that intent to Perry. *See Dion*, 2007 ME 87, ¶¶ 25-27, 928 A.2d 746 (holding that the court did not err in concluding that a defendant was not in custody where he made statements to law enforcement officers in his own home, was not physically restrained during the conversation, never manifested an intent to terminate the interaction, and the officers never indicated to the defendant that they had probable cause to arrest him). Therefore, viewing the totality of circumstances in light of the *Michaud* factors, the court did not err in concluding that Perry was not in custody for *Miranda* purposes and consequently denying his motion to suppress.

B.     Admission of Expert Testimony on Strangulation

[¶17]   Perry next argues that the court abused its discretion in admitting the testimony of an expert witness who testified about the causes, effects, and symptoms of strangulation. Specifically, he argues that this testimony should have been excluded because a determination of whether the victim was "strangled," a term defined by statute, was within the common

knowledge of a layperson, and thus the testimony could not assist the jury in making that determination.

[¶18] We review a trial court's evidentiary rulings for an abuse of discretion or clear error. *See State v. Mooney*, 2012 ME 69, ¶ 9, 43 A.3d 972. Pursuant to the Maine Rules of Evidence, a witness who has been qualified as an expert is not limited to testifying in the form of an opinion; rather, she may provide expert testimony in another form so long as it "will help the trier of fact to understand the evidence or to determine a fact in issue." M.R. Evid. 702.

[¶19] "Strangulation," as the term is used in 17-A M.R.S. § 208(1)(C), is defined as "the intentional impeding of the breathing or circulation of the blood of another person by applying pressure on the person's throat or neck." Here, because the State's strangulation expert did not review any facts pertinent to the case, she did not give an opinion as to whether the victim had been strangled. Rather, she testified to the technical definition of strangulation and how that definition is distinct from "choking," although laypeople often use those terms interchangeably. She also described the symptoms associated with strangulation and noted how those symptoms occur as a result of an interruption in the flow of oxygen to the brain.

[¶20]    Although the use of a medical expert is not essential to establishing the element of strangulation, the expert's testimony here helped the jury "understand the evidence," specifically as it pertained to the technical definition of "strangulation," and how that term is distinct from "choking." M.R. Evid. 702.    Further, by testifying to the physiological effects of and symptoms associated with strangulation, the State's expert assisted the jury in "determining a fact in issue," namely, whether Perry's alleged conduct constituted "strangulation" as defined in the statute.    M.R. Evid. 702. Therefore, the court did not abuse its discretion in admitting the expert's testimony.

C.    Sentencing

[¶21]    Lastly, Perry argues that the court abused its discretion in sentencing him to serve consecutive terms of imprisonment for Counts II and III, aggravated assault committed under circumstances manifesting extreme indifference to the value of human life and aggravated assault with a dangerous weapon, respectively.

[¶22]    "We review a sentencing court's imposition of consecutive sentences for an abuse of discretion."  *State v. Downs*, 2009 ME 3, ¶ 29, 962 A.2d 950.  In Maine, a court "must impose sentences concurrently unless

it finds a statutory basis for imposing the sentences consecutively." *Id.*; *see* 17-A M.R.S. § 1256(2) (2016). Title 17-A § 1256(2)(A) and (D) provide that a court may impose consecutive sentences when the circumstances of the crimes are particularly serious or where "the convictions are for offenses based on different conduct or arising from different criminal episodes." Conversely, where multiple crimes arise out of a single criminal episode, a court may not impose consecutive sentences where one of the crimes is a lesser included crime of the other or where "[o]ne crime consists only of a conspiracy, attempt, solicitation or other form of preparation to commit, or facilitation of, the other." *Id.* § 1256(3)(A)-(B).

[¶23] Here, the court imposed consecutive sentences on Counts II and III after concluding there existed "at least one" and perhaps two grounds for doing so. First, the court noted that although Perry engaged in a prolonged physical assault of the victim, "there are [discrete] episodes of conduct and I think the State is entitled to ask for and the court is authorized to impose consecutive sentences in [this] instance." Second, the court noted that even if Counts II and III arose out of the same criminal episode, it was still at liberty to impose consecutive sentences pursuant to 17-A M.R.S. § 1256(2)(D) because "this is a situation where the seriousness of the conduct involved

does provide a basis under the statute . . . to impose a sentence in excess of the maximum." Both of the court's determinations are supported by the record.

[¶24] With regard to the discrete events, the victim testified that, between the time she was strangled and the time she was cut with the knife, she had time to get up, go into the bathroom, and take a shower. Further, in both its opening statement and closing argument, the State made clear that it was charging Perry with these separate assaultive actions. It argued to the jury that Count II—assault with extreme indifference to the value of human life—was supported by evidence that Perry strangled the victim and that Count III—assault with a dangerous weapon—correlated with evidence that Perry cut the victim's hand with a knife. Aside from the fact that both assaults involved the same victim, there is no meaningful link between them. One assault was executed with Perry's hands while the other was carried out with a knife and there is no indication that one assault facilitated the other. *Cf. State v. Bunker*, 436 A.2d 413, 418-19 (Me. 1981) (concluding that the court abused its discretion in ordering consecutive sentences for convictions for kidnapping, rape, and gross sexual misconduct where the purpose of the kidnapping "was to facilitate the commission of the sex offenses").

[¶25]  With regard to the seriousness of Perry's conduct, the evidence demonstrated that he engaged in a prolonged, violent course of conduct which included pushing the victim to the floor, fracturing her wrist, strangling her to the point where she lost control of her bowels and bladder, beating her head against the wall and toilet, and cutting her hand with a knife.  No credible argument can be made that the seriousness of Perry's conduct did not rise to the level required for a sentence in excess of the maximum available for the most serious offense.  *See* 17-A M.R.S. § 1256(2)(D).  Thus, the court did not abuse its discretion in imposing consecutive sentences pursuant to either 17-A M.R.S. § 1256(2)(A) or 17-A M.R.S. § 1256(2)(D).

The entry is:

Judgment and sentences affirmed.

---

Andrea S. Manthorne, Esq. (orally), Roach, Hewitt, Ruprecht, Sanchez & Bischoff, Portland, for appellant Lee Perry

Kathryn Loftus Slattery, District Attorney, and Shira S. Burns, Asst. Dist. Atty. (orally), Prosecutorial District #1, Alfred, for appellee State of Maine

York County Superior Court docket number CR-2014-2697
FOR CLERK REFERENCE ONLY