MAINE SUPREME JUDICIAL COURT                     Reporter of Decisions
Decision:    2021 ME 7
Docket:      And-19-480
Argued:      November 19, 2020
Decided:     January 28, 2021
Revised:     March 16, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

BRANDON GLENN

CONNORS, J.

[¶1] Brandon Glenn appeals from a judgment of conviction, entered on his conditional guilty plea pursuant to M.R.U. Crim. P. 11(a)(2), to the offense of possession of sexually explicit material, 17-A M.R.S. § 284(1)(C) (2020). He argues that the Superior Court (Androscoggin County, *Clifford, A.R.J.*) erred by denying his motion to suppress his statements to police regarding sexually explicit material depicting minors found on his electronic tablet and any evidence of sexually explicit material depicting minors discovered as a result. The primary thrust of his argument is that because he has a diagnosis of Autism Spectrum Disorder (ASD), he was incapable of giving voluntary consent. Because we discern no error in the trial court's determination, we affirm its decision.

## I. BACKGROUND

[¶2]  The following facts, drawn from the testimony of the two officers involved in the investigation and an audio recording of the events at issue, are essentially undisputed.  On March 13, 2018, two Maine State Police officers—a special agent with the Computer Crimes Unit and a detective—went to a home in Lewiston after receiving a tip from the National Center for Missing and Exploited Children (NCMEC) that an internet protocol address associated with the residence was engaged in unlawful internet activity.  The officers arrived at the residence at approximately 9:30 a.m. and wore civilian clothing.  They knocked on the door several times before a woman and a young man answered the door.  The two individuals would later identify themselves as Joseph, the son of the homeowner, and Deborah, the homeowner's girlfriend.  The officers identified themselves and asked if they could step inside the residence; Joseph and Deborah agreed.

[¶3]  Once inside, the special agent asked, "Is it just the two of you that live here?"  Deborah answered, "No, there's Kevin and there's another boy."[1]  At no point did Deborah deny living in the home.  The other individual that

---

[1]  Kevin Glenn is the owner of the home and father of the defendant, Brandon Glenn.

Deborah mentioned would later be identified as the defendant, twenty-seven-year-old Brandon Glenn.

[¶4] The special agent explained that he was in the early stages of an investigation of "child pornography" and asked Joseph and Deborah whether they had any information about whom in the residence may have downloaded images from the internet. Deborah or Joseph stated that Glenn might have information and escorted the officers to his room.

[¶5] The officers knocked on Glenn's bedroom door and he answered. Although Glenn told the officers that he had been up all night watching anime, the special agent described him as "[p]retty pleasant and conversational . . . very pleasant, very polite, very candid." Initially, the special agent asked to speak with Glenn in the hallway outside his bedroom. The special agent asked Glenn if he had any information about whom in the home had downloaded sexually explicit material depicting minors, and Glenn immediately responded that he had downloaded a number of images. Given the nature of the conversation, the special agent asked Glenn if he would prefer to speak one-on-one or with the other family members. Glenn replied that he would prefer to speak outside the presence of his family members, and they proceeded into his bedroom. The special agent showed Glenn multiple images that had been flagged by the

4

NCMEC and asked him if he recognized them.[2] Glenn responded that he recognized the images and that he had in fact downloaded them.

[¶6] Following this admission from Glenn, the special agent asked how he was able to find and download the images. As the conversation progressed, the special agent asked Glenn if he would be willing to show him more of the images that he had downloaded. Although Glenn initially declined to show the special agent more images, eventually he told the special agent that he had downloaded onto his tablet approximately 1,600 images of sexually explicit material depicting minors and showed the special agent a number of them.

[¶7] The conversation between the special agent and Glenn continued, and the special agent expressed his desire to search Glenn's tablet. During this exchange, Glenn told the special agent that he had difficulty working because he has "the old Asperger's." The special agent repeatedly told Glenn that he did not have to consent to the search. Glenn ultimately signed the consent-to-search form, however, after the special agent informed Glenn that he would seize the tablet and then apply for a warrant.

---

[2] The detective testified that, during the special agent's conversation with Glenn, she was primarily outside Glenn's room speaking with Glenn's family members and ensuring that the scene was safe.

[¶8]  Both officers testified at the suppression hearing that Glenn did not exhibit any signs that would lead them to believe that he was unable to fully comprehend the consequences of signing a consent form.  At no point during the encounter did the special agent tell Glenn that he was under arrest or otherwise not free to terminate the encounter.  In fact, Glenn was not arrested at the scene but was given a summons to appear at a later date.

[¶9]  On September 4, 2018, a grand jury in Androscoggin County indicted Glenn on twenty-five counts of possession of sexually explicit materials (Class C) in violation of 17-A M.R.S. § 284(1)(C).  On January 24, 2019, Glenn filed a motion to suppress all incriminating statements he made to the officers as well as all the images of sexually explicit material depicting minors that had been discovered on his tablet.  Specifically, Glenn contended that he had been subject to custodial interrogation and thus should have been advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  He also argued that due to his ASD, neither the statements that he made to the police nor the consent to search his tablet had been voluntary.

[¶10]  On February 27, 2019, the trial court began an evidentiary hearing on Glenn's motion to suppress.  During the first day of the hearing, the court heard testimony from the special agent, the detective, and Dr. William Barter, a

6

psychologist. While Dr. Barter had evaluated Glenn at the request of his father for a psychosexual risk assessment and had not reviewed the audio recording of Glenn's encounter with the police, his testimony in the hearing focused on how Glenn's ASD affected his ability to respond to questioning by the police. In particular, Dr. Barter testified that, given the nature of ASD as a "social cognitive disorder," individuals with the diagnosis need continued exposure to particular situations in order to respond appropriately. At the conclusion of that day's hearing, based on its assertion that some of Dr. Barter's testimony involved information not included in his report, the State asked that it be allowed to have Glenn evaluated by its own expert.

[¶11]  On March 5, 2019, over Glenn's objection, the court granted the State's motion and ordered Glenn to submit to a mental examination pursuant to 15 M.R.S. § 101-D (2020). The second day of the hearing on the motion to suppress, held on July 22, 2019, consisted exclusively of testimony from the State's expert, psychologist Luke Douglass, PhD, whose forensic evaluation of Glenn was based on his review of Glenn's medical and psychiatric records, the audio recording of the questioning of Glenn, and a three-hour interview with Glenn.

[¶12]  Dr. Douglass testified that Glenn had a "mild deficit" but had the capacity to understand the social cues of the situation in which he was questioned and the ability to act in his own interests, including to "understand and waive his *Miranda* rights."[3]  The court then allowed Glenn a week to let the court know if he intended to present further testimony from Dr. Barter.  Glenn did not file anything with the court indicating an intent to present any further testimony.

[¶13]  Dr. Barter was recalled to testify on the third and final day of the hearing.  He again testified about why he believed that Glenn's ASD interfered with his ability to give a knowing and voluntary consent to the search of his tablet and explained how he disagreed with Dr. Douglass's opinion.  In particular, he opined that Dr. Douglass's administration of the Grisso's Instruments test, a test that both he and Dr. Douglass described as specifically related to assessing *Miranda* issues, could not have accurately determined Glenn's ability to interact with law enforcement because "too much time had

---

[3] While at times Glenn's interaction with the police was referenced in terms of assessing his ability to consent to a waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), as noted below, no *Miranda* warning was given in this case.  Dr. Douglass's testimony, however, read as a whole and in conjunction with his written report, is reasonably understood as concluding that Glenn had the capacity to consent to the special agent's request to speak with him and subsequently search his tablet.  Glenn also filed no motion for further findings of fact or conclusions of law pursuant to M.R.U. Crim. P. 41A(d).  *See State v. Sasso*, 2016 ME 95, ¶ 19, 143 A.3d 124 (stating that, in the absence of a motion for further findings, we infer that the trial court found all the facts necessary to support denial of a motion to suppress).

lapsed" between the administration of the test and the "*Miranda* event." Dr. Barter acknowledged that he had not listened to the officers' recorded interview of Glenn.

[¶14] After Dr. Barter's testimony, the motion judge orally denied Glenn's motion to suppress and then issued a written order incorporating his oral findings. The court concluded that Glenn had the capacity to and did voluntarily speak to the special agent and consent to the search of his tablet. The court noted that it found more persuasive the assessment of Dr. Douglass, which went more directly to the issue before the court, and observed that Dr. Douglass had reviewed all the evidence, including the audio recording of Glenn's interview with the police.

[¶15] Glenn entered a conditional guilty plea to all twenty-five counts of possession of sexually explicit material and was sentenced to a two-year concurrent sentence, all suspended, with two years of probation. This timely appeal followed. *See* M.R. App. P. 2B.

## II. DISCUSSION

[¶16] Glenn contends that the trial court erred in denying his motion to suppress evidence because (1) the officers did not secure a warrant prior to entering the home; (2) the officers did not advise him of his rights under

*Miranda* before questioning him; and (3) his statements to officers and his consent to search his tablet were involuntary given his ASD. In keeping with our long-established precedent, "[w]e will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." *State v. Chan*, 2020 ME 91, ¶ 13, 236 A.3d 471 (quotation marks omitted).

A.   Warrantless Entry

[¶17]  Glenn argues that Deborah and Joseph lacked sufficient authority to provide a valid consent to enter the home, requiring the suppression of all subsequently obtained evidence.

[¶18]  For purposes of the Fourth Amendment, an individual's home is traditionally held to be sacrosanct, making warrantless searches "*per se* unreasonable, subject to a few specifically established, carefully drawn and much guarded exceptions." *State v. Boilard*, 488 A.2d 1380, 1383-84 (Me. 1985) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One well-established exception to the warrant requirement arises when entries are conducted pursuant to consent.  *Id.* at 1384; *State v. O'Donnell*, 2019 ME 98, ¶ 30, 210 A.3d 815.  An entry that is conducted pursuant to the consent of a third party is constitutional if officers, at the time the consent was given to enter a

10

residence, reasonably believe that the consenting individual possessed sufficient authority to consent to the entry. *O'Donnell*, 2019 ME 98, ¶ 30, 210 A.3d 815 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990)).

[¶19] Such was the case here. The audio recording and testimony from the officers demonstrate that a reasonable officer, confronted with the same circumstances as the officers here, would have believed that Deborah and Joseph, who appeared to be of appropriate age and disposition, possessed the authority to consent to the officers' entry when they opened the door early in the morning and invited the officers to enter. When asked by the special agent if they were the only two residents, Deborah did not deny living there but instead answered that two additional people resided in the home, including Glenn. Joseph lived at the residence and was eighteen years old.[4] *See O'Donnell*, 2019 ME 98, ¶ 30, 210 A.3d 815 ("It is well-settled that law enforcement may enter and search a residence upon the voluntary consent of the owner or a person who jointly occupies and has common authority over the premises.").

---

[4] Although testimony from the officers suggested that Joseph was a minor, he can be heard on the recording of the search telling the officers that he was eighteen years old.

B.    The Absence of *Miranda* Warnings

[¶20]  Glenn next argues that his statements and the evidence obtained thereafter should have been suppressed because the officers subjected him to custodial interrogation without advising him of his rights under *Miranda*. There is no dispute that Glenn was not advised of his *Miranda* rights.  To require a *Miranda* warning, however, a defendant must be both "in custody" and "subject to interrogation."  *State v. Ames*, 2017 ME 27, ¶ 12, 155 A.3d 881 (quotation marks omitted).  Because Glenn was not "in custody" for purposes of *Miranda*, we do not examine further whether the special agent's questioning rose to the level of "interrogation."

[¶21]  For purposes of *Miranda*, an individual "is considered 'in custody' when subject to either a formal arrest or a restraint on freedom of movement to the degree associated with formal arrest."  *State v. Hopkins*, 2018 ME 100, ¶ 36, 189 A.3d 741.  We "objectively review the pertinent circumstances to decide whether a reasonable person in the defendant's position would have felt free to terminate the interaction with law enforcement or if there was a restraint on freedom of movement of the degree associated with a formal arrest."  *Id* (quotation marks omitted).  To assist in this determination, we have

enumerated a number of factors that should be viewed in their totality to determine whether an individual is "in custody":

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

*State v. Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222. "We treat the determination of whether a person was in custody for *Miranda* purposes as a mixed question of law and fact," *State v. Perry*, 2017 ME 74, ¶ 14, 159 A.3d 840, and "will not

reverse a trial court's custodial determination unless the record fails to rationally support the finding." *Michaud*, 1998 ME 251, ¶ 4, 724 A.2d 1222.

[¶22]  When an individual is in familiar surroundings, is not physically restrained, and is interviewed in a "relatively low-key and non-confrontational" manner, the *Michaud* factors weigh in favor of concluding that the individual is not in custody.  *See State v. Nadeau*, 2010 ME 71, ¶ 55, 1 A.3d 445; *Perry*, 2017 ME 74, ¶ 16, 159 A.3d 840.  In *Nadeau*, for example, we were confronted with circumstances similar to those surrounding Glenn's interview.  Nadeau was an undergraduate student at the University of Maine at Farmington when University police received information that he had shown another student sexually explicit material depicting minors.  *Nadeau*, 2010 ME 71, ¶ 3, 1 A.3d 445.  Officers proceeded to his dorm room, knocked, and asked if they could come in to speak with him.  *Id.* ¶¶ 3-4.  Nadeau agreed and asked if he could shut the door to ensure privacy.  *Id.* ¶ 4.  The officers then questioned Nadeau about the sexually explicit material without advising him of his rights under *Miranda*.[5]  *Id.* ¶¶ 4-5.  He responded that the sexually explicit material was likely "preexisting" from an earlier case when his parents had taken him to

---

[5]  One of the officers did advise Nadeau that any information could be used against him, but "Nadeau interrupted and stated, 'I've already been through all this.'"  *State v. Nadeau*, 2010 ME 71, ¶ 6, 1 A.3d 445.

14

court after finding sexually explicit material on his computer, and he agreed to write a statement. *Id.* ¶ 4. Applying the factors set forth in *Michaud,* we concluded that Nadeau was not "in custody" for purposes of *Miranda*. *Id.* ¶ 55. In particular, we noted that (1) the officers entered Nadeau's room with his permission; (2) the questioning was done in "the familiar surroundings of Nadeau's own dorm room"; (3) the officers told Nadeau multiple times "that he was neither under arrest nor going to jail at that time"; (4) the interview was brief; and (5) the "interview style was relatively low-key and non-confrontational." *Id.*

[¶23] These factors support the same conclusion here. Glenn was in his own room and the officers entered only with his consent. The special agent repeatedly told Glenn that he was not under arrest and conducted the interview in a conversational manner. Glenn was never physically restrained, nor did he ever manifest a desire to terminate the encounter—factors that we have held weigh in favor of concluding that an individual was not in custody. *See State v. Dion*, 2007 ME 87, ¶¶ 25-27, 928 A.2d 746.

[¶24] Based on the totality of the circumstances, evaluated with an eye toward the *Michaud* factors, we conclude that Glenn was not in custody. Because both custody and interrogation must be present to trigger the need to

provide *Miranda* warnings, *see Ames*, 2017 ME 27, ¶ 12, 155 A.3d 881, the trial court did not err in denying his motion to suppress on this ground.

C.    Voluntariness of Statements and the Tablet Search

[¶25]   We now come to Glenn's primary argument—that his ASD rendered his statements and the search of his tablet involuntary.  We review the trial court's "factual findings regarding voluntariness for clear error and its ultimate determination regarding voluntariness de novo."    *Hopkins*, 2018 ME 100, ¶ 43, 189 A.3d 741.  "The State bears the burden to prove that a confession was voluntary beyond a reasonable doubt."    *State v. Annis*, 2018 ME 15, ¶ 13, 178 A.3d 467.

[¶26]   The determination of whether statements to police were voluntarily made depends upon the totality of the circumstances, particularly "the details of the interrogation; duration of the interrogation; location of the interrogation; whether the interrogation was custodial; the recitation of *Miranda* warnings; the number of officers involved; the persistence of the officers; police trickery; threats, promises or inducements made to the defendant; and the defendant's age, physical and mental health, emotional stability, and conduct."  *Hopkins*, 2018 ME 100, ¶ 44, 189 A.3d 741 (quotation marks omitted).  The voluntariness of an individual's consent to a search is

similarly gauged by assessing the totality of the circumstances. *State v. Barlow*, 320 A.2d 895, 899 (Me. 1974) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).

[¶27]  Thus, in determining voluntariness, the question is not whether the special agent reasonably believed that Glenn could provide and was providing a voluntary consent, but rather whether Glenn in fact could and did provide such consent.  *See State v. Rees*, 2000 ME 55, ¶ 3, 748 A.2d 976 (statement must be the product of an individual's "own free will and rational intellect" in order to be considered voluntary (quoting *State v. Caouette*, 446 A.2d 1120, 1123-24 (Me. 1982))).[6]  As noted above, an individual's diagnosed mental condition is one factor among many when determining whether that condition undermined the individual's ability to provide a

---

[6]  In *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  This decision was preceded by a ruling in which the Supreme Court held that, in considering the validity of consent in the context of a Fourth Amendment search, the court looks at the totality of the circumstances, including the mental state of the defendant.  *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 234 (1973).  Since the Court's decision in *Connelly*, courts have debated how to harmonize the two decisions.  *See Lopera v. Town of Coventry*, 640 F.3d 388, 399 (1st Cir. 2011).  We need not concern ourselves with this debate, however, because Glenn invoked his rights under both the U.S. and Maine Constitutions, and, in *State v. Rees*, we rejected the State's invitation to overturn our previous interpretation of Maine Constitution, Art. 1, § 6, as reflected in *State v. Caouette*, 446 A.2d 1120 (Me. 1982), to adopt the ruling in *Connelly* that coercive police activity is required to suppress a defendant's statements as involuntary.  *State v. Rees*, 2000 ME 55, ¶ 4, 748 A.2d 976.  Hence, under the Maine Constitution, whether the issue of voluntariness is presented in the context of a defendant's statements or a consent to a search, police coercion may be a relevant factor, but it is not dispositive.

voluntary consent.  *See Hopkins*, 2018 ME 100, ¶ 44, 189 A.3d 741 (quotation marks omitted).

[¶28]  Given that the test is essentially a factual one—whether the statements or consent were a product of free will and intellect—we defer to the trial court's findings in the absence of clear error.  *See id.* ¶ 35.  Thus, in *Rees*, we upheld the trial court's finding that statements made by the defendant were involuntary due to the defendant's dementia, *Rees*, 2000 ME 55, ¶¶ 1-2, 748 A.2d 976, while in *State v. Addington*, 518 A.2d 449, 452 (Me. 1986), we upheld a trial court's denial of a motion to suppress in the context of conflicting expert testimony regarding the impact of Addington's mental illness, stating that "it was for the trial court as the factfinder to decide the credence to be given the various expert witnesses."  *Id.*  We also noted Addington's refusal to speak with officers at various points and concluded that this rationally supported the trial court's conclusion that his statements were voluntary.  *Id.*

[¶29]  Here, the trial court, as in *Addington*, did not clearly err in finding more persuasive the testimony of the State's expert, Dr. Douglass, who focused on the consent issue and had listened to the audio recording.  In that recording, Glenn is cogent, speaks intelligently, and reflects an understanding of the consequences of his situation and his ability to say no, for example, by initially

denying consent to search his tablet and then relenting, not based on coercion, but on the realization that the police would be able to obtain a warrant for its seizure in any event.  The special agent told Glenn numerous times that Glenn did not have to speak to him or agree to the search.  He engaged in no trickery and maintained a conversational tone throughout the interview.  We conclude there was no legal error in the trial court's conclusion that Glenn was capable of voluntary consent and did voluntarily agree to answer the special agent's questions and permit the search of his tablet.

The entry is:

Judgment affirmed.

---

Henry W. Griffin, Esq. (orally), Auburn, for appellant Brandon Glenn

Andrew S. Robinson, District Attorney, and Patricia A. Mador, Asst. Dist. Atty. (orally), Prosecutorial District III, Lewiston, for appellee State of Maine

Androscoggin County Unified Criminal Docket docket number CR-2018-2475