STATE OF MAINE             UNIFIED CRIMINAL DOCKET

CUMBERLAND, ss.            DOCKET NO. CUMCD-CR-20-20047

STATE OF MAINE         )

                            )

        v.                  )    **ORDER ON MOTION TO SUPPRESS**

                            )

NICHOLAS R. WEEKS      )

## Introduction

Defendant Nicholas R. Weeks has been charged by criminal complaint with operating under the influence (29-A M.R.S.A. § 2411(1-A)(C)(1)), criminal mischief (17-A M.R.S.A. § 806(1)(A)), refusing to submit to arrest (17-A M.R.S.A. § 751-B(1)(B)), operating beyond license condition or restriction (29-A M.R.S.A. § 1251(1)(B)), and disorderly conduct (17-A M.R.S.A. § 501-A(1)(A)(1)). He seeks to suppress statements he made to law enforcement on the night of his arrest. For the following reasons, the defendant's motion is GRANTED in part and DENIED in part.

## Factual Findings

Around 9 p.m. on January 16, 2020, Officer Malcolm Marshall of the Freeport Police Department received notice that someone on Wartown Road had called to complain of a possibly intoxicated driver. Officer Marshall met with the complainant, who reported that a man plowed his driveway, left the property, and then returned, whereupon the complainant and the man chatted and shared stories. When the complainant asked the plow driver to leave, the driver got agitated, backed across the road into a ditch, and left.

AUG 4 '23 AM 10:15
REC'D CUMB CLERKS OFC

1

There was fresh snow on the ground and Officer Marshall was able to see tire tracks leading from the road into a ditch. In the driveway across the street from the complainant's residence, Marshall observed a broken wooden stake and two pickup trucks: a silver Toyota registered to the defendant, Nicholas Weeks, and a silver Ford with a plow attachment.

Officers Marshall and Brown, who were in uniform and carrying sidearms, knocked on the door of the house with the two trucks in the driveway. An unidentified female (believed to be the defendant's girlfriend) answered the door and stated that she lived there. She invited the officers in. They stepped into the mudroom, directly inside the door. The mudroom was approximately 4 feet by 4 feet. The woman indicated that the driver of the truck was at the back of the house. Eventually, the defendant came from the back of the house to greet the officers. He identified himself as "Nick Weeks." Officer Marshall observed that the defendant had bloodshot, glassy eyes, and smelled of intoxicants. He also had swollen, bloody knuckles. Officer Brown positioned himself behind the defendant so that he could not retreat into the house.

Audio of the officers' interaction with the defendant was captured on the camera in Officer Marshall's police cruiser.[1] The police asked some initial questions about what had happened that evening with the neighbors and why the defendant

---

[1]     The court admitted a recording of the encounter into evidence as State's Exhibit 1. The timer on the recording does not correspond with clock time. Rather, the recording begins at 00:00 and proceeds chronologically. In their arguments to the court, the parties refer to a different timing framework that does not appear to match the recording the court received.

had bloody hands. Approximately 3 minutes and 25 seconds into the encounter, the defendant told the officers, "Get out of my doorstep." One of the officers responded, "No," and said they were trying to figure out what had happened. A few seconds later, the defendant admitted he had been drinking. He started shadowboxing Officer Brown and contacted his chest. Officer Brown pushed him back and warned him that if he did it again, he would go to jail. At this point, the defendant was relatively calm and tried to explain to the officers that he had not done anything wrong.

Over the next several minutes, the officers repeatedly asked the defendant to come outside to continue their discussion, explaining that they were trying to investigate the neighbors' complaint. The defendant refused. At some point, Sergeant Powers arrived and stood on the front steps of the house. The defendant resisted the officers' entreaties to step outside and said, "something is definitely going to happen." (Exhibit 1 at 10:44).

Approximately 11 minutes into the encounter, the unidentified woman suggested that the officers come back in the morning, and they responded that they were not going anywhere. A few moments later, in response to questions from the officers, the defendant admitted he plowed the driveway. He became agitated, fluctuating between swearing in anger and sobbing. The officers remained calm.

The officers again asked the defendant if he wanted to go outside, and he responded, "Absolutely." (Exhibit 1 at 13:52). The defendant then told the unidentified woman that he would be right back and said, "they're going to arrest

me." (Exhibit 1 at 14:00). He also said he was being dragged outside. Over the next several minutes, the officers alternated between requests and orders to the defendant that he step outside. At one point, an officer told the defendant that he (the defendant) needed to leave the house before the officer. During this exchange, the officers did not ask the defendant any questions about the events of the evening.

As the defendant finally started to exit the house, he was swearing and yelling at the officers. Officer Brown positioned himself behind the defendant, blocking his access so he could not go back inside. Twenty minutes into the encounter, one of the officers told the defendant that he would be arrested if he continued to yell at them. The officers also told the defendant they were giving him a warning for disorderly conduct and an order not to go to the neighbors' house.

The officers then asked the defendant a series of questions about how much he had to drink. (Exhibit 1 at 20:35-22:50). The defendant admitted that he had a "couple drinks" and that he had stopped drinking 35 minutes ago. (Exhibit 1 at 21:24-21:32). The defendant started shouting in Sergeant Powers's face. He was warned to step back. He refused and then bumped the sergeant in the chest, at which point he was told he was under arrest and placed in handcuffs. The officers struggled to restrain him. The arrest occurred approximately 24 minutes into the encounter.

The officers did not ask the defendant any additional questions. The defendant continued to yell at the officers as they handcuffed him, and thereafter made a handful of spontaneous utterances while being transported to the jail.

4

## Procedural History

The defendant filed a motion to suppress all evidence seized during his encounter with the police as well as all statements he made. At a hearing on the motion to suppress, the defendant informed the court that he sought only to suppress the statements, arguing that they were elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).[2]

The court heard testimony from Officer Marshall but was not able to finish the hearing because of time constraints. The parties thereafter communicated to the court in writing that they did not need additional hearing time. The defendant rests on his written motion and argument made at the hearing, and the State has submitted a brief in opposition to the motion to suppress. In reaching its decision, the court has considered the testimony at the hearing, State's Exhibit 1, and the parties' written and oral arguments.

## Discussion

"A person who is in custody and subject to interrogation must be advised of the rights referred to in *Miranda v. Arizona* in order for statements made during the interrogation to be admissible against [him] as part of the State's direct case at trial." *State v. Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247 (citations omitted). Here, the officers did not provide the defendant with *Miranda* warnings. The defendant argues that he was in custody from the moment he told the officers to get off his

---

[2]    The defendant does not assert that the statements were involuntary.

5

doorstep, and that all statements he made in response to interrogation after that point should accordingly be suppressed. The State bears the burden of establishing by a preponderance of the evidence that a *Miranda* warning was not required. *State v. Dominique*, 2008 ME 180, ¶ 9, 960 A.2d 1160.

For *Miranda* purposes, an individual "is considered 'in custody' when subject to either a formal arrest or a restraint on freedom of movement to the degree associated with formal arrest." *State v. Glenn*, 2021 ME 7, ¶ 21, 244 A.3d 1023. (quotation marks omitted). This inquiry requires the court to "'objectively review the pertinent circumstances to decide whether a reasonable person in the defendant's position would have felt free to terminate the interaction with law enforcement or if there was a restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quotation marks omitted). In *State v. Michaud*, the Law Court identified several factors to assist the court in determining whether an individual is "in custody":

(1) the locale where the defendant made the statements;

(2) the party who initiated the contact;

(3) the existence or non-existence of probable cause to arrest (to the extent communicated to the defendant);

(4) subjective views, beliefs, or intent that the police manifested to the defendant, to the extent they would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

(5) subjective views or beliefs that the defendant manifested to the police, to the extent the officer's response would affect how a reasonable person in the defendant's position would perceive his or her freedom to leave;

6

(6) the focus of the investigation (as a reasonable person in the defendant's position would perceive it);

(7) whether the suspect was questioned in familiar surroundings;

(8) the number of law enforcement officers present;

(9) the degree of physical restraint placed upon the suspect; and

(10) the duration and character of the interrogation.

1998 ME 251, ¶ 4, 724 A.2d 1222; *Glenn*, 2021 ME 7, ¶ 21, 244 A.3d 1023.

The court considers these factors "'in their totality, not in isolation.'" *State v. Jones*, 2012 ME 126, ¶ 22, 55 A.3d 432. Moreover, the Law Court has observed that "[w]hen an individual is in familiar surroundings, is not physically restrained, and is interviewed in a 'relatively low-key and non-confrontational manner,' the *Michaud* factors weigh in favor of concluding that the individual is not in custody." *Glenn*, 2021 ME 7, ¶ 22, 244 A.3d 1023.

The court finds that the defendant was not in custody until 14 minutes into the encounter, when he told his girlfriend that the police were going to arrest him. Prior to that, the balance of factors supports a finding that the interaction was non-custodial. The initial conversation occurred in the defendant's mudroom after the officers had been invited in. The discussion, involving only two officers at first, was friendly and low-key. Although one officer stood behind the defendant, the defendant was not physically restrained or forced to move outside. The officers did not accuse him of committing a crime; instead, they conveyed their desire simply to understand what had occurred with the neighbors. Even after the defendant contacted Officer Brown's chest, the officers remained calm. *See Glenn*, 2021 ME 7,

7

¶ 22, 244 A.3d 1023; *State v. Clark*, 2021 ME 12, ¶¶ 26-29, 246 A.3d 1165 (affirming finding that questioning was non-custodial where defendant made statements on front steps of his residence; officers never indicated they had probable cause to arrest; there was no physical restraint; defendant exited the building of his own volition; and officers were nonconfrontational, compassionate, and polite); *State v. Perry*, 2017 ME 74, ¶ 16, 159 A.3d 840 (holding that defendant was not in custody despite fact that officer awoke him in his bedroom because single officer conducted questioning, defendant was never physically restrained, questioning was brief, and officer never told defendant he intended to arrest him).

It is true, as the defendant asserts, that he told the officers to get off his doorstep, and they refused. The defendant's command, however, was half-hearted, and he immediately resumed conversing with the officers. Perhaps most significantly, he declined the officers' requests to go outside, demonstrating his subjective belief that he was free to dictate the terms of the interaction. *See State v. Dion*, 2007 ME 87, ¶¶ 25-28, 928 A.2d 746 (finding that defendant was not in custody where his "decision to stay out on the front steps, contrary to the officer's suggestion that they move inside," demonstrated that he "subjectively knew he had control over the conversation"). After reviewing the totality of the circumstances, *Jones*, 2012 ME 126, ¶ 22, 55 A.3d 432, the court concludes that the defendant was not in custody for the first 14 minutes of the interaction and that *Miranda* warnings accordingly were not required.

Although the questioning was not custodial at the outset, the circumstances shifted 14 minutes into the encounter, when the defendant told his girlfriend that he was going to be arrested (he had just admitted to plowing the neighbors' driveway) and complained of being dragged outside. Thereafter, the officers repeatedly ordered the defendant, who became increasingly agitated, to leave the house. They also told him that he was not permitted to retreat into the home and physically boxed him in. It appears from the recording that the officers had not yet decided whether to arrest the defendant, and they remained polite, at times asking the defendant to "please" go outside. Nonetheless, they made clear with their words and actions that the defendant was not free to terminate the interaction. *Glenn*, 2021 ME 7, ¶ 21, 244 A.3d 1023; *State v. Lowe*, 2013 ME 92, ¶ 19, 81 A.3d 360. These circumstances, viewed in their totality, would lead a reasonable person to feel constrained to a degree associated with a formal arrest. *Id.*

Although the defendant was "in custody" for *Miranda* purposes after he expressed his belief that he was going to be arrested, that does not end the inquiry. Only statements made in response to interrogation are subject to suppression. *Bridges*, 2003 ME 103, ¶ 23, 829 A.2d 247. The state argues that many of the defendant's statements were spontaneous utterances that did not result from police questioning.

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

9

reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). "[B]rief, neutral questions that are not part of an effort to elicit a confession or admission do not constitute interrogation." *State v. Reese*, 2010 ME 30, ¶ 8, 991 A.2d 806. The court has reviewed the recording of the exchange between the defendant and the police. The only express questioning after the defendant is in custody occurs between 20:35 and 22:50 of the recording, when the officers ask the defendant about his drinking. The statements the defendant made during that period must be suppressed. The rest of the defendant's comments are spontaneous statements not subject to exclusion. *State v. Lear*, 1998 ME 273, ¶ 9, 722 A.2d 1266 ("The *Miranda* rule does not apply to spontaneous statements that are not a response to interrogation.").

## Conclusion

For the foregoing reasons, the defendant's motion to suppress his statements is GRANTED in part and DENIED in part.

The entry is:

The defendant's motion to suppress is GRANTED as to statements made between 20:35 and 22:50 of State's Exhibit 1; and DENIED as to all other statements.

DATED: 7/28/23

_____
Julia M. Lipez
Justice, Maine Superior Court

AUG 4 '23 AM10:15
REC'D CUMB CLERKS OFC

10